# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| JENNIFER MCCALL, on behalf of herself and all others similarly situated, | Case No.: 2:23-cv-03739-JLG-CMV |
| Plaintiff, | Judge James L. Graham<br>Magistrate Judge Chelsey M. Vascura |
| v. | **CLASS ACTION** |
| EXPRESS, INC., a Delaware Corporation, and DOES 1-50, inclusive, | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| Defendants. | **Violations of:** |

**Violations of:**

1. **California's Unfair Competition Laws ("UCL"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*;**

2. **California's False Advertising Laws ("FAL"), CAL. BUS. & PROF. CODE §§ 17500, *et seq.*;**

3. **California Consumer Legal Remedies Act ("CLRA"), CAL. BUS. & PROF. CODE §§ 17200, *et seq.*;**

**[DEMAND FOR JURY TRIAL]**

Plaintiff Jennifer McCall ("Plaintiff") bring this action, on behalf of herself and all others similarly situated, against Defendant Express, Inc. ("Express" or "Defendant"), and states:

## I.     NATURE OF ACTION

1.      Prices reflect a perceived value to consumers.[1] False advertising of prices can be used to manipulate consumers' value perception of products and cause consumers to overpay for them. Aware of the intertwined connection between consumers' buying decision processes and price, retailers like Defendant lure consumers with advertised discounts that promise huge savings and high value. But the promised savings are false, and the product's value reflected in its price is incorrect when the retailer inflates its prices due to advertised discounts off of some higher, made-up "original" price that no one ever pays. Defendant has continually advertised false price discounts for merchandise sold throughout its Express Factory Outlet stores. This class action seeks monetary damages, restitution, and declaratory and injunctive relief from Defendant arising from its deceptive business practice of

---

[1] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (1992) ("[P]rice is materially utilized in the formation of perceptions of the product's value and influences the decision to purchase the product or to continue to search for a lower price."); Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A "Rule of Reason" Approach*, 70 J. RETAILING 115, 118 (1994) ("[R]eference to a retailer's normal or regular price in retail sale price advertising provides the consumer with information used to determine perceived value").

advertising fictitious "original" prices and corresponding phantom discounts on apparel, accessories, shoes, and other items sold in its Express Factory Outlet stores.

2. False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand).[2] Consequently, false reference pricing schemes enable retailers, like Defendant, to sell products above their true market price and value—and consumers are left to pay the inflated price. Consumers are thus damaged by not receiving the promised discounts for products advertised with false reference pricing.

3. The following example of a hypothetical DVD seller, which is parallel to Defendant's deceptive business practice, illustrates the illegal false reference pricing scheme and its attendant harm to consumers. A seller knows it can sell a particular DVD at $5.00, which represents both the market price and the price at

---

[2] Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product.").

which the seller could regularly offer the DVD and make a profit. Instead, however, the seller creates a "original" price for the DVD of $100.00 and advertises the DVD as "on sale" at *90% off* rendering the *"sale" price* of the DVD $10.00. When a consumer purchases the DVD, he presumes he got a "good deal" on a DVD previously sold—i.e., valued by others in the market—at an "original" price of $100.00. The consumer's presumption and purchase stem directly from the seller's purposeful deception. For example, if the seller tried to sell that same DVD for $10.00 *without* referencing a false original price of $100.00, and the attendant 90% off discount, that seller would not be able to sell any DVDs at $10.00 because the true, original market price of the DVD is $5.00. In contrast, by presenting consumers with a false "original" price of $100.00, consumers will purchase the DVD at $10.00; the seller thus has fabricated an increase in demand for the DVD through the *perceived value* of both the DVD itself and the substantial discount of $90.00. Consumers' increased willingness and demand to pay $10.00 for the DVD will in turn impact the overall market price of the DVD. Therefore, the seller can create a false market price for the DVD at $10.00 by advertising a false "original" price and a corresponding phantom discount of 90% off. Plaintiff's case seeks to remedy this deception, its attendant harm to consumers, and that disparity—the inflated market price through Defendant's application of an illegal discounting scheme compared to the lower, more accurate market price without any false reference pricing.

4

4.     Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Defendant violated, and continues to violate, California and federal law. Specifically, Defendant violated and continues to violate the following: California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500, *et seq.* (the "FAL"); California's Consumers Legal Remedies Act, CAL. CIV. CODE §§ 1750, *et seq.*; and the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

5.     Plaintiff brings this action on behalf of herself and other similarly situated consumers who have purchased one or more apparel items, accessories, and other items at Defendant's Express Factory Outlet stores that were deceptively represented as discounted from a false advertised reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have overpaid for merchandise tainted by this deceptive pricing scheme. Plaintiff also seeks to enjoin Defendant from using false and misleading misrepresentations regarding former price comparisons in its labeling and advertising permanently. Further, Plaintiff seeks to obtain damages, restitution, reasonable costs and attorney's fees, and other appropriate relief in the

amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

## II.    JURISDICTION AND VENUE

6.    This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendant.

7.    The Southern District of Ohio has personal jurisdiction over Defendant and is the proper venue for this action pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims arose in this District and Defendant's misconduct alleged herein occurred in this District. Further, Defendant is a corporation or other business entity which is headquartered in Columbus, Ohio.

8.    Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District; a substantial part of the events giving rise to Plaintiff's claims arose in this District; and Defendant's misconduct alleged herein emanated from this District.

### III.   GENERAL ALLEGATIONS

**A.   Retailers Benefit from False Reference Pricing Schemes.**

9.   Defendant engages in a false and misleading reference price scheme in the marketing and selling of its Express Factory Outlet merchandise at its Express Factory Outlet stores.

10.   Retailers, including Defendant, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products.[3] Nonetheless, consumers frequently lack full information about products and as a result often use information from sellers to make purchase decisions.[4]

---

[3] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (e.g., style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (e.g., longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (e.g., whether the shirt's cotton was produced using organic farming methods). Michael R. Darby, & Edi Karni. *Free Competition and the Optimal Amount of Fraud*, J. LAW & ECONOMICS 16 no. 1 (1973): 67-88, at 68-69.

[4] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Phillip Nelson. *Information and Consumer Behavior*. J. POLITICAL ECONOMY 78, no. 2 (1970): 311-29, at 311-12.

11.     Defendant's deceptive advertised reference prices are thus incorporated into consumers' decision process. First, a product's "price is also used as an indicator of product quality."[5] In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to consumers' desire for bargains or deals."[6] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[7] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[8]

---

[5] Dhruv Grewal & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?*, J.PUBLIC POLICY & MARKETING (1992): 52-62, at 54;  *see also* Richard Thaler. *Mental Accounting and Consumer Choice*. MARKETING SCIENCE 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

[6] Dhruv Grewal, & Larry D. Compeau. *Comparative Price Advertising: Informative or Deceptive?,* J. OF PUBLIC POLICY & MARKETING (1992): 52-62, at 52.

[7] Peter Darke & Darren Dahl. *Fairness and Discounts: The Subjective Value of a Bargain*. J. OF CONSUMER PSYCHOLOGY 13, no 3 (2003): 328-38, at 328.

[8] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal.'" Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205.

12. Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[9] Internal reference prices are "prices stored in memory" (e.g., a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (e.g., a "suggested retail price," or other comparative sale price).[10] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[11] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no prior internal reference.[12] In other words, "[t]he deceptive potential of such advertised reference

---

[9] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*, J. OF CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 68.

[10] Glenn E. Mayhew & Russell S. Winer. *An Empirical Analysis of Internal and External Reference Prices using Scanner Data*. J. CONSUMER RESEARCH 19, no. 1 (1992): 62-70, at 62.

[11] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan. *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*. J. OF MARKETING 62 (1998): 46-59, at 48.

[12] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Richard Thaler. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 212.

prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[13] Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[14] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][15]

13. Retailers, including Defendant, understand that consumers are susceptible to a perceived bargain, and therefore, they have a substantial financial interest in making consumers believe they are receiving a bargain, even if they are not. Contrary to the illusions of bargains in Defendant's advertisements, consumers

---

[13] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

[14] Gurumurthy Kalvanaram & Russell S. Winer. *Empirical Generalizations from Reference Price Research*. MARKETING SCIENCE 14, no. 3 (1995): G161-G169, at G161; *see also* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 65-66. ("The results of this research provide support for the position that [external] reference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product.").

[15] Dhruv Grewal & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J.PUBLIC POLICY & MARKETING 18, no. 1 (1999): 3-10, at 7.

are actually overpaying for Defendant's products and not receiving any promised discounts due to the relationship between Defendant's deceptive price comparisons, consumer purchase decisions, and the economic principles of demand and price.

**B. Defendant's Fraudulent Price Discounting Scheme Violates California State Law and Federal Pricing Regulations.**

14. Defendant has continually engaged in a false reference pricing scheme injurious to consumers by advertising apparel, accessories, and other items at discounted, "sale" prices. Defendant marketed the "sale" prices as discounts from the "original" prices set forth on the products' price tags for merchandise sold at Defendant's Express Factory Outlet stores. However, the advertised discounts are nothing more than phantom markdowns because (1) the represented "original" prices, *i.e.,* the prices listed on the price tags for the merchandise, are artificially inflated; (2) the products are never offered for sale at the full original price for any substantial period of time, (if at all); and (3) the original prices are never the true market price for the products Defendant sells.

15. Defendant marks each item with a price tag that sets forth the "original" price at which the item was purportedly offered for sale. That original price is printed on the item's price tag. Defendant then display large sale-discount signage on top of or alongside each rack of clothing or accessories, advertising a "discounted % off," or a discounted whole-price reduction for the item, which is substantially less than the original price listed on the price tag. The false discounts are thus not written on

*each* product's individual price tag or always displayed in a 1:1 ratio for each product, but instead are presented to consumers on signs bearing a false "__% Off" for a category of merchandise or an area of the store (e.g., "__% off shirts"). However, the products were never sold at the "original" or "price tag" prices. Thus, the advertised reference price is false and used solely to induce consumers into believing that the merchandise was once sold at the reference price and from which the false, "discounted," corresponding sale price is derived.

16.     The percentage-off discounts advertised in Defendant's Express Factory Outlet stores promise to consumers that if they purchase certain items, then they will receive a specific percentage-off discount of those items, which are represented as being valued at their higher advertised "original" price. In actuality, the percentage-off discounts are not true discounts as they are applied to an advertised "original" price that was completely fabricated by Defendant and that does not represent a price at which Defendant regularly sold the item in the normal course of business. Consequently, consumers do not receive the discount they were promised by Defendant when they purchase items from Defendant at a purportedly discounted price.

17.     The products sold at Express Factory Outlet stores are predominantly made exclusively for sale at its outlet stores and not sold anywhere else, such as

Express mainline retail store.[16] Defendant freely admits it "offers made-for-outlet products at Express Factory Outlet stores …" Doc No. 10 at 5. The reason why the original price is either false or misleading is because Defendant either: (1) has never offered the outlet goods for sale at the original price (in the case of its made-for-outlet merchandise) or (2) has offered the goods for sale at their original price at some time period in the distant past—in violation of the 90 day time period afforded it to discount merchandise under California law and the federal regulation requiring

---

[16] *See Sperling v. Stein Mart, Inc.*, 291 F. Supp. 3d 1076, 1084 (C.D. Cal. 2018) ("In exclusive product cases, a store, often an outlet store, sells a lower-price, different version of a product sold in a traditional retail store. The outlet uses the price of the product made for the retail store as a comparative reference price on price tags. However, the actual product being sold in the outlet is made exclusively for the outlet and is never sold for the comparative reference price at a traditional retail store. In those cases, courts generally find that a plaintiff can proceed with his or her claims."); *Branca v. Nordstrom, Inc.*, No. 14cv2062-MMA, 2015 WL 10436858, at *7–8 (S.D. Cal. Oct. 9, 2015) (denying a motion to dismiss where the plaintiff alleged that items at Nordstrom Rack were compared to full-price products sold at Nordstrom retailers and that "the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price"); *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *8 (N.D. Cal. May 11, 2017) (denying a motion for summary judgment in part where the plaintiffs asserted evidence that the defendant sold products exclusively made for its outlet stores but compared their prices to products sold in full retail stores); *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F.App'x 564, 567 (9th Cir. 2017) (reversing dismissal where the plaintiff alleged that Neiman Marcus Last Call used reference prices to products sold at Neiman Marcus retail stores even though the products were made exclusively for Neiman Marcus Last Call). Even assuming *arguendo* that other markets exist, this point is immaterial because Plaintiff has pled a violation of the FTCA, which is retailer-specific in proscribing false former prices, and the Ninth Circuit has unequivocally held the FTCA may serve as a predicate violation for a UCL claim. *Rubenstein*, 687 F.App'x at 567 ("allegations of a [FTCA guideline] violation … are sufficient to state a claim under the UCL.").

the discount to be presented from a recent, regularly offered, original price. Upon information and belief, mainline (out-of-season) Express merchandise is a small percentage of its outlet stores' total inventory and is typically several years removed from being marketed at the original price, if ever.[17]

18.     Additionally, Defendant is not offering a discount or a percentage off (% off) a competitor's price for goods offered for sale in the relevant market. In the case of its "made for outlet" products, there are no other retailers who sell those goods; they are exclusively sold by Express Factory Outlets.  In the case of its out-of-season merchandise, the Express Factory Outlet merchandise being offered at outlet stores is not offered by any other relevant market competitors in the 90-day time period preceding the sale because it is old and outdated.

19.     Defendant's outlet-only-merchandise is never offered for sale, nor actually sold, at its advertised original price. Accordingly, the false reference prices advertised on the outlet-only merchandise reasonably (but wrongly) leads customers to believe that they are getting higher quality, mainline Express-branded merchandise at a significant discount when, in reality, customers are receiving inferior quality, made-for-outlet merchandise that has never been offered outside of the Express Factory Outlet and, even there, never at the false reference price

---

[17] Further discovery is needed to verify precisely how much, if any, of Defendant's outlet store inventory is comprised of *non*-made-for-outlet merchandise.

reflected on the items' price tag. Similarly, regular Express merchandise (i.e., *non-made-for-outlet merchandise*) that may have been previously offered for sale at an Express mainline store is never offered for sale at Express Factory Outlet stores at its advertised original price within 90 days of that price being offered in the market.

20.    Thus, there is no other market for Express Factory Outlet store clothing other than (1) Express Factory Outlet stores or (2) in the case of its out-of-season merchandise, Express retail stores. Further, there is no regular or market price for the products being sold at the Express Factory Outlet stores other than the price set by Defendant at its stores. There is no meaningful difference between Defendant's Express Factory Outlet stores in that the same products are sold at every store and the same fraudulent pricing scheme is deployed uniformly.

21.    Defendant conveys its deceptive pricing scheme to consumers through promotional materials, in-store displays, and print advertisements. For example, in Defendant's Express Factory Outlet stores, the pricing scheme is prominently displayed, advertising deep discounts on various items throughout the store. Specifically, the represented discounts are advertised on placards placed at, on, or above the particular products being discounted. They are printed on red card stock with white print offering the advertised "__% off". The placards appear as follows:[18]

---

[18]    Other in-store photographs from *California* Express Factory Outlets demonstrating the extent of discount signage on display throughout the stores are



22. Defendant's pricing scheme is intended to increase sales but has the effect of depriving consumers of the benefit of their bargain. The clothing items and attire listed at "regular" or "original" prices were never offered for sale at those prices for a substantial period of time. The original or price tag price is not the price at which Defendant expects to sell its merchandise; it is merely a basis for misleading consumers into believing they are receiving a substantial discount from the false original price.

---

attached as **Exhibit A**. In addition to other amendment contained in the First Amended Complaint, Plaintiff has added substantially more photographs to the new **Exhibit A**. Not only do these provide direct insight into the prevalence of the (false) discount signage occurring within the stores, but they also include camisoles, tank tops, and sweaters, like the ones purchased by Plaintiff. *See, e.g.*, **Ex. A** at 8, 25, 59.

23. Nowhere in Defendant's Express Factory Outlet stores does Defendant disclose that the reference or original prices used are not: (1) former prices; or (2) recent, regularly offered former prices; (3) or prices at which identical products are sold elsewhere in the market. Nor does Defendant disclose any date at which the original prices were offered in the market. The omission of these disclosures, coupled with Defendant's use of fictitious advertised reference prices, renders Defendant's pricing inherently misleading to reasonable consumers, including Plaintiff.[19]

24. The advertised reference prices are false and induce consumers into believing that Express Factory Outlet merchandise was once sold at the reference price, in the near term, and will be again if the consumer does not make a purchase at the "bargain" price. Defendant engages in this practice knowing full well that the advertised products are never actually offered or sold at the advertised reference prices.

---

[19] Claims brought pursuant to the CLRA, UCL, and FAL are all "governed by the 'reasonable consumer' test." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "Where, as here, the reasonable consumer test applies to plaintiff's underlying [false discount pricing] claims, it is a 'rare situation in which granting a motion to dismiss is appropriate.'" *Rubenstein*, 687 F.App'x. at 566 (citing *Williams*, 552 F.3d at 939). Numerous courts analyzing allegations of false discount pricing have likewise held that the "reasonable consumer" challenges are inappropriate on the pleadings. *See, e.g., Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW, 2020 WL 5769080, at *3 (C.D. Cal. July 17, 2020) (citing *Williams*, 552 F.3d at 939); *Chester v. TJX Companies, Inc.*, No. 515CV01437ODWDTB, 2016 WL 4414768, at *10 (C.D. Cal. Aug. 18, 2016); *Horosny v. Burlington Coat Factory of CA, LLC*, No. 15-cv-5005, 2015 WL 12532178, at *4 (C.D. Cal. Oct. 26, 2015).

25.     Furthermore, Defendant advertises the false reference prices to induce consumers into believing that Express Factory Outlet merchandise is worth the inflated, false reference price such that the lower "sale" price represents a limited time discount. Customers, however, do not enjoy any such advertised discount when they purchase items from Defendant's Express Factory Outlet stores.

26.     Defendant advertises constant discounts in its Express Factory Outlet stores for nearly all items they offer for sale, and Defendant's employment of perpetual false discounts deprives consumers of a fair opportunity to fully evaluate the offers and to make purchase decisions based on accurate information. Consumers have no way of discerning that Defendant's pricing and discount representations throughout its Express Factory Outlet stores are false and misleading.

27.     Defendant's systematic and pervasive pricing policy and conduct as described herein is in direct violation of federal and California pricing regulations.

28.     Under California law, for instance, a seller may only discount an item from its own ***original price*** for up to 90 days; or in the alternative, it may offer a discount from the original price of an item being offered by a competitor, within the relevant market, for up to 90 days.  In either scenario, a seller can only offer a "sale" from an original price for 90 days. At that point, on day 91, the seller has two options: the product must either return to its full original price, or the seller may continue to sell the product at the discounted price, ***___as long as it discloses to the consumer the___***

***date on which the product was last offered for sale at its alleged former price***. *See* CAL. BUS. & PROF. CODE § 17501. Under California law, a seller cannot use an old, outdated, "original price" as the basis for a sale or discount, unless it discloses to the consumer the date on which the prior original price was offered in the market. *Id.*

29.     Moreover, Defendant's advertised discounts were fictitious because the reference prices did not represent a *bona fide* price at which Defendant previously sold or offered to sell the products, on a regular basis, for a reasonably substantial period of time, as required by the Federal Trade Commission ("FTC"). *See* 16 C.F.R. § 233.1, *et seq.*

30.     Defendant's perpetual discounting of its Express Factory Outlet merchandise constitutes false, fraudulent, and deceptive advertising because the "original" reference price listed is substantially higher than those prices actually offered by Defendant. The reference prices are a total fiction used exclusively as a benchmark from which the false discount and corresponding "sale" price is derived. Defendant's scheme has the effect of tricking consumers into believing they are getting a significant deal by Express Factory Outlet merchandise at a steep discount, when, in reality, consumers are now overpaying for Express Factory Outlet merchandise. Defendant's deceptive pricing scheme has artificially raised the prices actually paid by consumers by creating the false impression of a bargain.

31.    The process of how Defendant's false reference pricing scheme injures consumers proceeds as follows. Defendant advertised its merchandise with false reference prices, which then caused consumers to be deceived into overvaluing those products. As a result, consumers' demand for the Express Factory Outlet merchandise has artificially increased. This artificial, illusory increase in consumers' demand further resulted in an increase in the price of Defendant's Express Factory Outlet merchandise. This resultant price increase has been reflected in the "discounted sale" price at which consumers, including Plaintiff, paid for the Express Factory Outlet merchandise. Consumers thus unknowingly purchased the Express Factory Outlet merchandise at inflated prices all caused by Defendant's deceptive false reference pricing scheme. The Express Factory Outlet merchandise is worth less than the inflated prices at which they are offered as a "discount." Without the false reference pricing scheme, the Express Factory Outlet merchandise would *not* command the higher, inflated prices. Consumers like Plaintiff have therefore overpaid for Express Factory Outlet merchandise—which, to circle back, was caused by Defendant's deception.

32.    Thus, Defendant's scheme intends to, and does, provide harmful misinformation to customers. This misinformation communicates to consumers, including Plaintiff, that the products sold in Defendant's Express Factory Outlet stores have a greater value than the advertised discounted price. Defendant's

misconduct therefore: (1) deprived Plaintiff and Class members of the benefit of the bargain; and (2) caused Plaintiff and Class members to overpay (i.e., pay a price premium) for Defendant's outlet merchandise.

### C. Defendant's Fraudulent Price Discounting Scheme Harms All Consumers.

33. All consumers are harmed by Defendant's conduct as alleged herein. The impact of Defendant's conduct pervades the entire market for its Express Factory Outlet merchandise irrespective of individual consumer's beliefs or purchasing decision processes because, as explained below, the artificially increased demand generated by Defendant's false reference pricing scheme results in increased actual sales prices beyond the prices Defendant could command in the absence of the false reference pricing scheme. Accordingly, consumers' subjective beliefs about the value of Express Factory Outlet merchandise are inconsequential to the injury they face when purchasing said merchandise. To be harmed by Defendant, it matters not whether consumers believe they will receive a discount on Express Factory Outlet merchandise when they purchase it, nor does it matter why consumers purchased Express Factory Outlet merchandise. Likewise, consumers need not have any certain perceptions about Defendant's pricing nor need they any insight into the true market prices for apparel, accessories, and other related items to have been harmed by Defendant's false discount pricing scheme.

34.    When consumers purchase Express Factory Outlet products, they will all overpay, and they will all not receive the benefit of the promised discounts. The process of how Defendant's false reference pricing scheme injures consumers demonstrates how all consumers are harmed. In short, Defendant's false reference pricing caused an illusory, artificial increase in the demand and attendant price for Express Factory Outlet merchandise resulting in all consumers, including Plaintiff, having no choice but to overpay for said merchandise at the resultant inflated prices. When consumers like Plaintiff now purchase Express Factory Outlet merchandise, the merchandise is worth less than the inflated price at which it is purchased.

35.    A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.[20] Empirical studies thus "suggest that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[21] As to Defendant's products, consumers are misled and incorrectly overvalue them due to Defendant's false price comparisons. The price at which consumers purchase

---

[20] Richard Thaler, *Mental Accounting and Consumer Choice*, MKTG SCIENCE 4, no. 3 (1985): 199-214, at 212.

[21] Jerry B. Gotlieb & Cyndy T. Fitzgerald. *An Investigation into the Effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*. J. OF APPLIED BUS. RESEARCH 6, no. 1 (1990): 59-69, at 66. Moreover, "if a higher reference price encourages consumers to pay a higher price for a product than the consumer was willing to pay for the identical product with a lower reference price, then the practice of using high reference prices would be deceptive." *Id*. at 60.

Defendant's products reflects consumers' overvaluation of the products as Defendant can get away with commanding an inflated price due to this overvaluation. Academic researchers have documented this relationship between reference prices, and consumers' attendant behaviors and the harm inflicted on them by deceptive retailers as follows:

> [A]dvertised reference prices in these deal-oriented advertisements can enhance buyers' internal reference prices . . . . These enhanced internal reference prices, when compared with the lower selling price, result in higher transaction value perceptions. The increase in perceived transaction value enhances purchases and reduces search behavior for lower prices. If sellers intentionally increase the advertised reference prices above normal retail prices, this is, inflate advertised reference prices, the resulting inflated perceptions of transaction value would be deceptive. Harm to both buyers and competitors could result from the effect of the inflated transaction value on buyers' search and purchase behaviors.[22]

36.   To further explain, the false pricing information in Defendant's advertisements, in-store displays, and promotional materials first caused consumers to perceive they were receiving a bargain on Express Factory Outlet merchandise when purchased at its "sale" price. This consumer perception resulted in these consumers gaining an additional "transaction value"[23] for their Express Factory

---

[22]Dhruv Grewal, Kent B. Monroe & Ramayya Krishnan, *The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions*, J. OF MKTG 62 (1998): 46-59, at 46.

[23] Thaler, Richard. *Mental Accounting and Consumer Choice*. MKTG SCI. 4, no. 3 (1985): 199-214, at 205 ("To incorporate … the psychology of buying into the model, two kinds of utility are postulated: acquisition utility and transaction utility.

Outlet purchases, which they would not have otherwise gained absent Defendant's false reference pricing scheme. Consumers' valuation of Express Factory Outlet merchandise thus increased. This increase in consumers' perceived valuation of Express Factory Outlet merchandise then caused an artificial increase in the aggregate demand of said merchandise. This artificial increase in the aggregate demand then caused an attendant illusory increase in the price of Express Factory Outlet merchandise. Defendant's false reference pricing scheme has thus disrupted the natural market for its Express Factory Outlet merchandise, and Defendant has been able to charge all consumers inflated prices, as reflected in both the actual "sale" and "original" prices of Defendant's outlet merchandise. Everyone is now forced to pay above-market prices for Express Factory Outlet merchandise should they decide to make a purchase at any of Defendant's retail or outlet stores. All consumers will thus pay an inflated price for Express Factory Outlet products regardless of the reason for their purchase.[24]

---

The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'."); Dhruv Grewal & Larry D. Compeau, *Comparative Price Advertising: Informative or Deceptive?*, 11 J. PUB. POL'Y & MKTG. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."); Dhruv Grewal, & Larry D. Compeau. *Pricing and public policy: A research agenda and an overview of the special issue*. J. PUB. POL'Y & MKTG 18, no. 1 (1999): 3-10, at 7.

[24] Plaintiff intends to fully explore in discovery how and to what extent Defendant exploited this increase in aggregate demand to raise its prices and Plaintiff

37.     Fundamental economics concepts and principles provide a foundation upon which the uniform harm of Defendant's false reference pricing scheme is based. One such principle is that cost and demand conditions determine market prices all consumers pay for products.[25] The aggregate demand curve for a product, including those sold by Defendant, represents consumers' valuation of the product, and as consumers' valuation increases, the demand curve shifts outward. When the aggregate demand curve of a product shifts outward, the market price for the product will increase. A specific individual's willingness to pay for a product will not negate how market prices, as determined by aggregate demand, dictate what all consumers purchasing a given product will pay.

38.     Therefore, Defendant's conduct alleged herein has impacted the market prices of its Express Factory Outlet products, and any one individual consumer's subjective beliefs or idiosyncratic rationales will not isolate them from the resultant inflation in Express Factory Outlet prices. Economic theory ensures that as the aggregate demand curve for Express Factory Outlet merchandise moved outward,

---

anticipates such fulsome discovery will reveal policies well informed of the literature cited in this complaint that capitalize on the widespread consumer confusion created by the false reference and discount pricing scheme alleged herein.

[25] Mankiw, N. *Essentials of Economics.* 8th Edition. Boston, MA: Cengage Learning, 2015, at 66 ("[P]rice and quantity are determined by all buyers and sellers as they interact in the marketplace"); *see also,* Hal R. Varian, *Microeconomics Analysis.* 3rd Edition. New York, NY: W. W. Norton & Company, 1992, at 23-38, 144-57, 233-353 & 285-312.

all consumers must pay a higher price for Express Factory Outlet products than they would have paid absent Defendant's false reference pricing scheme. Plaintiff and members of the proposed Class thus suffered a common impact from Defendant's ability to sell Express Factory Outlet merchandise at inflated prices and it was Defendant who caused the inflation and chose to sell its Express Factory Outlet products at the inflated prices—and who continue to sell Express Factory Outlet products at inflated prices to the detriment of all purchasers.

### D. Investigation

39. Plaintiff's counsel has conducted a large-scale, comprehensive investigation into the Defendant's pricing practice. Plaintiff's counsel tracked items in Defendant's outlet stores and mainline retail stores in California[26] beginning in January of 2021, and continuously through September of 2022. Plaintiff's counsel's investigation included tracking the prices of Defendant's merchandise at the outlet store where Plaintiff purchased her items, located at 4051 Camino de la Plaza, San Diego, CA 92173 (the "Las Americas Outlets"), as well as other Express Factory

---

[26] Plaintiff's counsel also investigated Express outlet stores in other states, including Oregon, New Jersey, and New York, during this time period, but those investigations are not relevant to this action except insofar as the provide additional evidence of the scope and uniformity of Defendant's pricing scheme. Beyond that, these investigations have no bearing on this action and, if anything, will inform the basis for additional actions against Defendant based on the consumer laws of those respective states. To be clear, the conclusions that Plaintiffs' counsel drew about Defendant's *California* Express Factory Outlet stores were not based upon the investigation of outlets outside California.

Outlets across California. An overwhelming majority of products in Defendant's Express Factory Outlet stores remained on sale for the duration of this tracking period, discounted against a false reference price. The pricing scheme on Defendant's products were uniform at every location. *See* **Exhibit B** for a list of exemplar products from the 2021 California investigation.[27]

---

[27] It is noteworthy that, applying California law, numerous false discount pricing cases hold that plaintiffs are *not* required to perform or provide *any* specific details of pre-suit investigations in false discount pricing cases. *See, e.g.*, *Rubenstein*, 687 F.App'x at 568 ("Without an opportunity to conduct any discovery, Rubenstein cannot reasonably be expected to have detailed personal knowledge of Neiman Marcus's internal pricing policies or procedures for its Last Call stores. Because Rubenstein need not specifically plead facts to which she cannot 'reasonably be expected to have access,' her allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation."); *Stathakos*, 2016 WL 1730001, at *3–4 (finding that the plaintiffs' complaint satisfied Rule 9(b) even though the plaintiffs had not plead a pre-suit investigation) (citation omitted); *Knapp v. Art.com, Inc.*, No. 16-CV-00768-WHO, 2016 WL 3268995, *4 (N.D. Cal. June 15, 2016) (finding that the plaintiff's allegations of a "perpetual sale" were alone sufficient); *Horosny*, 2015 WL 12532178, at *4 (denying a motion to dismiss where the plaintiff pled a deceptive pricing scheme "on information and belief" and not based on a pre-suit investigation); *see also Branca*, 2015 WL 10436858, at *7 (finding the plaintiff adequately alleged "why the 'Compare At' prices are false as former prices— because they necessarily cannot be former prices or prevailing market prices, as the items were never sold elsewhere for any other price besides the Nordstrom Rack retail price"); *see also Le v. Kohls Dept. Stores, Inc.*, 160 F.Supp.3d 1096, 1099 (E.D. Wis. Feb. 8, 2016) (denying a motion to dismiss where the plaintiff had not conducted a nationwide pre-suit investigation before alleging the defendant's comparison prices did not reflect a price at which its merchandise was routinely sold). Put simply, arguments attacking the sufficiency of Plaintiff's counsel's pre-suit investigation allegations at the pleading stage under the auspices of Rule 9(b) are, in actuality, premature challenges to Plaintiff's *factual allegations*, which must be accepted as true at the pleadings stage. Such attempts should be rejected as such

40.     To be clear, Plaintiff's counsel tracked the pricing of merchandise offered for sale at Express Factory Outlet's California outlet locations—including the outlet store where Plaintiff shopped, the Las Americas Outlets—beginning in January 2021. The investigation revealed that items listed for sale were never offered for sale at their full "original" price. The investigation included visits to Express Factory Outlet stores outlet stores nearly every day to verify the prices being offered by on the Express Factory Outlet stores merchandise. The pricing scheme was uniform and identical across all stores visited in California, including at Las

---

a requirement would "raise the pleading standard of Rule 9(b) to unprecedented heights." *See Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-AGR, 2016 WL 3483206, at *3 (C.D. Cal. June 17, 2016) ("But no authority requires [p]laintiffs to include that information in the pleadings; arguably that level of evidentiary detail would be improper, even under Rule 9(b).").

Even still, complaints containing similar pre-suit investigation allegations, like Plaintiff's here, have routinely been sustained at the pleading stage. *See, e.g.*, *Adams v. Cole Haan, LLC*, No. 8:20-CV-00913-JWH-DFMx, 2021 WL 4907248 (C.D. Cal. Mar. 1, 2021); *Dahlin v. Under Armour, Inc.*, No. CV 20-3706 PA (JEMx), 2020 WL 6647733 (C.D. Cal. July 31, 2020); *Inga*, 2020 WL 5769080, at *1; *Harris v. PFI W. Stores, Inc.*, No. SACV 19-2521 JVS (ADSx), 2020 WL 3965022, at *1 (C.D. Cal. Apr. 9, 2020); *Calderon v. Kate Spade & Co., LLC*, No. 3:19-CV-00674-AJB-JLB, 2020 WL 1062930 (S.D. Cal. Mar. 5, 2020); *Fisher v. Eddie Bauer LLC*, No. 19-cv-857 JM (WVG) 2020 WL 4218228 (S.D. Cal. Feb. 3, 2020); *Dennis v. Ralph Lauren Corp.*, No. 16-cv-1056-WQH-BGS, 2017 WL 3732103 (S.D. Cal. Aug. 29, 2017); *Rael v. New York & Co., Inc.*, No. 16-CV-369-BAS (JMA), 2017 WL 3021019 (S.D. Cal. July 17, 2017); *Azimpour v. Sears, et al.*, No. 15-CV-2798 JLS (WVG), 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017); *Fallenstein v. PVH Corp., et al.*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint).

Americas where Plaintiff shopped. The only thing that changed was the advertised

"__% off" certain merchandise items.

41.     Plaintiff's counsel's investigation revealed that the "original" or "price

tag" price of the items Plaintiff purchased was never the true market price at Express

Factory Outlet preceding Plaintiff's purchases. Instead, Defendant continuously

offered the items for sale at falsely "discounted" prices, including those products

purchased by Plaintiff.[28] Plaintiff's counsel's investigation revealed that this was a

---

[28] Relevant case law also provides that Plaintiff is not required to plead pre-suit investigation related to the specific products they purchased. *Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint) at 5-6, (expressly rejecting argument that investigation must include items purchased by the plaintiff); *Dahlin*, 2020 WL 6647733 at *4 ("Although Plaintiff's counsel's investigation apparently did not track the specific garments Plaintiff purchased, the Complaint nevertheless alleges sufficient facts about a uniform course of conduct to plausibly support a conclusion that the same allegedly fraudulent practices applied to the items Plaintiff purchased."); *Covell v. Nine W. Holdings, Inc.*, No. 3:17-cv-01371-H-JLB, 2018 WL 558976, at *4 (S.D. Cal. Oct. 31, 2017), ECF No. 10, ¶ 13 and Exs. A-L (motion to dismiss denied where item plaintiff purchased—"Stefao" snakeskin print high heels—were *not* included in complaint exhibits supporting pre-suit investigation). Again, **Exhibit B** is a summary of a small sample of products tracked in Plaintiff's counsel's investigation provided to better "give defendant[] notice of the particular misconduct which is alleged to constitute the fraud charged[.]" *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001); *see also Koller v. Med Foods, Inc.*, No. 14-CV-02400-RS, 2015 WL 13653887, at *4 (N.D. Cal. Jan. 6, 2015) (recognizing that even if the plaintiff was required to perform an investigation, it need not include the actual product the plaintiff purchased). In other words, Plaintiff's identification of similar misrepresentations across different stores indicates the alleged misleading practices are systematic in nature and "it would hardly be a defense" to say that Defendant's reference prices *sometimes* happen to be actual, recent, original prices (they are not). *Id.* at *3. As *Koller* pointed out, even

pervasive practice at the Express Factory Outlet stores, as hundreds of items remained continuously discounted from their "original" or "price tag" price and were not offered for sale at their original price. Defendant engages in a systematic scheme to continuously "discount" its merchandise without ever offering the merchandise for sale at their "original" or "price tag" prices. This pricing scheme was uniform and identical across all stores visited in California, including the Express Factory Outlet at Las Americas.

42.    Therefore, the "original" prices on the merchandise sold at Express Factory Outlet stores are either false original prices or severely outdated prices that were never offered in the relevant market.

43.    Despite Plaintiff's counsel's best efforts at investigation, the full extent of Defendant's false and deceptive pricing scheme can only be revealed through a full examination of Defendant's pricing records that are exclusively in Defendant's possession.

### IV.    PARTIES

**Plaintiff**

44.    Jennifer McCall resides in San Diego, California. On June 12, 2021, Plaintiff went shopping for some new clothing at the Express Factory Outlet store at

---

if "some percentage" of Defendant's labeling may be accurate, consumers are "entitled" to representations that are accurate "by design, not by happenstance." *Id.* at *3-4.

the "Las Americas Outlets, located at 4051 Camino de la Plaza, San Diego, CA

92173. In reliance on Defendant's false and deceptive advertising, marketing and

discount pricing scheme, Plaintiff purchased the following item from the Las

America Outlets on June 12, 2021:

| No. | Item: | False Reference Price: | Purchase Price: |
|---|---|---|---|
| 1 | Women's Camisole; Satin Layering Cami White | $36.95; 30% off | $25.86 |
| 2 | A light green women's pullover sweater | $29.95; 50% off | $14.97 |
| 3 | A light green women's tank top shirt | $20.00; 50% off | $10.00 |

45.     Plaintiff examined several items at the Las Americas Outlets before

deciding on what item to purchase. The items Plaintiff purchased include the

following: (1) women's camisole; satin layering cami white (the "women's

camisole"), which had a price tag reference price of $36.95 and an advertised

discount of 30% off shown on a nearby red and white placard; (2) a light green

women's pullover sweater (the "pullover sweater"), which had a price tag reference

price of $29.95 and an advertised discount of 50% off shown on a nearby red and

white placard; and (3) a light green women's tank top shirt (the "tank top"), which

had a price tag reference price of $20.00 and an advertised discount of 50% off

shown on a nearby red and white placard. After reviewing the advertised price tag

prices and "sale prices" for the items listed above, Plaintiff examined the above-

described merchandise further, and picked out her clothing sizes for each item.

46.     During her time at the Las Americas Outlets on June 12, 2021, Plaintiff noticed numerous red and white rectangular discount signs posted throughout the Express Factory Outlet store advertising "20%, 30%, 40% and 50% Off" discounts on various items grouped by categories of merchandise (e.g., "shirts __% off") next to piles or racks of clothing items throughout the store. After observing the original prices of the item and the accompanying sale price, Plaintiff believed she was receiving a significant discount on the items she had chosen. Because Plaintiff liked the items, felt that the discounted price would likely not last, and believed she was getting a significant bargain on the merchandise, Plaintiff proceeded to the register and purchased Defendant's products.

47.     Plaintiff paid a purchase price of $25.86 for the women's camisole, after relying on the accompanying "30% off" discount sign and the false reference price of $36.95; a purchase price of $14.97 for the pullover sweater, after relying on the accompanying "50% off" discount sign and false reference price of $29.95; and a purchase price of $10.00 for the tank top, after relying on the accompanying "50% off" discount sign and false reference price of $20.00. Each advertised discount was a material representation to Plaintiff, and she relied upon them in making her purchase decision. Plaintiff paid a pre-tax total of $50.83 for the products she purchased at the Express Factory Outlet store. However, Plaintiff did not receive the benefit of her bargain and, in actuality, paid an inflated price for the merchandise

beyond what they would have commanded in the absence of the falsely advertised discounts. Plaintiff would not have made these purchases without the misrepresentations made by Defendant of the items' purported discounts. Plaintiff has therefore suffered economic injury as a direct result of Defendant's unlawful, unfair, and fraudulent conduct.

### Plaintiff's Damages

48.     Plaintiff has been injured and incurred quantifiable actual damages as a result of Defendant's fraudulent pricing scheme, which can be calculated through the use of regression analysis.

49.     Plaintiff overpaid for the products she purchased as described herein. And it was Defendant's false reference pricing scheme and attendant deception that caused Plaintiff to overpay. Despite Plaintiff's original belief that each product she purchased was discounted, and thus that its value was significantly greater than the sale price at which it was purchased, Plaintiff, in actuality, paid an *inflated* price for the product she purchased.

50.     Specifically, each of the following prices were inflated for the items Plaintiff purchased: (1) $36.95 ("original" price) and $25.86 ("sale" price) for the "Women's Camisole; Satin Layering Cami White" item; (2) $29.95 ("original" price) and $14.97 (sale price) for the "light green women's pullover sweater" item; (3) $20.00 ("original" price) and $10.00 (sale price) for the "light green women's

tank top shirt" item. The items Plaintiff purchased were all worth less than the amount Plaintiff paid for each of them. If Defendant had not employed the falsely advertised "original" prices for the three items Plaintiff purchased, then those three items would not have commanded such a high, inflated price.

51. Plaintiff was damaged by her purchases because Defendant's false reference price discounting scheme inflated the final selling price of the items she purchased, such that Defendant's false reference price discounting scheme caused Plaintiff to pay a price premium. Defendant's false reference price discounting scheme artificially inflated consumer demand, such that each consumer who purchased the corresponding product paid higher prices when compared to what they would have paid had Defendant not engaged in a false reference pricing scheme. Plaintiff would not have purchased the merchandise, or would have paid less for it, but for Defendant's representations regarding the false reference prices and purported discounts of the merchandise. Plaintiff was misled into believing that she was receiving substantial savings on the purchases of Defendant's products which was implied by the falsely advertised reference prices.

52. Objective measures demonstrate that Plaintiff overpaid for the Express Factory Outlet merchandise that she purchased. The difference between the sale price paid by Plaintiff due to the artificially increased demand for the products— caused by Defendant's false reference pricing scheme—and the market sale price

that the products would have commanded without Defendant's deception provides an objective measure by which Plaintiff was overcharged and injured by Defendant. The amount of inflation of the prices for the Express Factory Outlet merchandise items Plaintiff purchased caused by Defendant's deception thus measures how much Plaintiff overpaid. This amount can be quantified using regression analysis based on Defendant's historic pricing data.

53.     Plaintiff is susceptible to this harm reoccurring in the future because she regularly shops at outlets and *strongly* desires to shop at Defendant's Express Factory Outlet stores again and she cannot be certain that Defendant will have corrected this deceptive pricing scheme. Plaintiff strongly desires to shop at Express Factory Outlet stores in the future because (1) she likes the brand, (2) it offers clothing items during different seasons that are only offered during certain times of the year, and (3) it offers new merchandise for sale that Defendant has not sold before. Due to the enormous, fluctuating variety of styles and sizes of merchandise offered at Express Factory Outlet stores, Plaintiff is unable to parse what reference prices are inflated and untrue, and what prices are not because Defendant could change their pricing scheme at any time without Plaintiff's knowledge.

54.     Moreover, in connection with Plaintiff's strong desire to make future purchases at Express Factory Outlet stores, because Plaintiff does not know (and cannot reasonably determine) if Defendant will accurately or inaccurately represent

the purported discounts for the distinct apparel items she would like to buy in the future, and because Plaintiff is not knowledgeable about Defendant's pricing practices with regards to its apparel items that have not yet been offered for sale at Defendant's Express Factory Outlet stores, Plaintiff cannot be certain of the veracity or falsity of Defendant's advertised bargains for the *wide selection* of apparel and other products, including shoes and accessories, offered at Defendant's Express Factory Outlet stores. Accordingly, Plaintiff may again purchase a falsely discounted product at one of the Express Factory Outlet stores under the *reasonable* impression that the advertised reference price represented a *bona fide* former price at which the item was previously offered for sale by Defendant, even though the product is in fact marred by a false discount.[29]

---

[29] Similar allegations have been upheld in other false discount cases where the defendant has likewise challenged the plaintiffs' standing to seek injunctive relief. *See, e.g., Harris*, 2020 WL 3965022, at *3 ("A previously deceived plaintiff may have standing to seek injunctive relief in false advertising-based actions, 'even though the consumer now knows or suspects that the advertising was false at the time of the original purchase,' because knowledge that the advertisement 'was false in the past does not equate to knowledge that it will remain false in the future.'") (citing *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018)); *Adams*, 2021 WL 4907248, at *4 ("[T]he Ninth Circuit has held 'that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm.' … Here, Adams plausibly alleges that she regularly shops at outlet stores, that she would like to return to the Cole Haan outlet, but that she cannot currently trust that 'Cole Haan will label and/or advertise the merchandise truthfully and in a non-misleading fashion.'") (citations omitted).

55.     Plaintiff's case is substantially predicated on Defendant's violation of CAL. BUS. & PROF. CODE § 17501, an equitable claim, as Plaintiff's counsel's investigation revolved around ensuring that Defendant did not sell products at the indicated reference price within the ninety (90) days preceding Plaintiffs' purchase and, likewise, that Defendant failed to disclose to consumers the date on which products was last offered at its advertised reference price. This claim and test of liability go to the heart of Plaintiff's case and the same test is not available under a CLRA legal claim for damages. Thus, Plaintiff does not have an adequate remedy at law because the CLRA does not provide the same metric of liability as CAL. BUS. & PROF. CODE § 17501, which is integral not only to Plaintiff's prayer for restitution, but also to Plaintiff's very theory of liability at trial.

56.     Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, members of the Class, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing conduct that cannot be remedied with monetary damages. Accordingly, Plaintiff, members of the Class, and the general public lack an adequate remedy at law and an injunction is the only form of relief which will guarantee Plaintiffs and other consumers the appropriate assurances.

57.　Moreover, Plaintiff lacks an adequate remedy at law with respect to her claim for equitable restitution because she has not yet retained an expert to determine whether an award of damages can or will adequately remedy their monetary losses caused by Defendant. Particularly, as legal damages focus on remedying the loss to the Plaintiff and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the Defendant, legal damages are inadequate to remedy Plaintiff's losses because Plaintiff does not know at this juncture, and is certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.[30]

**<u>Defendant</u>**

58.　Plaintiff is informed and believes, and upon such information and belief alleges, Defendant Express, Inc., is a Delaware corporation with its principal executive offices in Columbus, Ohio. Plaintiff is informed and believes that Defendant owns and operates Express Factory Outlet stores in California, and

---

[30] Similar allegations have been upheld in other false discount cases where the defendant has likewise challenged the plaintiffs' ability to seek equitable relief following the decision in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020). *See, e.g., Dahlin*, 2020 WL 6647733, at *4-5; *Adams*, 2021 WL 4907248, at *3-4 (C.D. Cal. Mar. 1, 2021); *Fallenstein*, No. 21-CV-01690-AJB-AGS (S.D. Cal. Jan. 3, 2023) at ECF No. 29 (Order Denying Defendants' Motion to Dismiss Plaintiff's First Amended Complaint). *Dahlin v. The Donna Karan Co. Store, LLC*, No. 2:21-cv-07711-AB-JPRx (C.D. Cal. Mar. 16, 2022) at ECF No. 30 (Order Denying Motion to Dismiss Plaintiff's First Amended Complaint) at 5-10

advertises, markets, distributes, and/or sells clothing and accessories in California, and throughout the United States.

59. Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names. Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiff and members of the proposed the Class as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

60. The reference prices listed and advertised on products sold at Defendant's Express Factory Outlet stores are false reference prices, utilized only to perpetuate Defendant's false discount scheme.

61. Defendant knows that its reference price advertising is false, deceptive, misleading, unconscionable, and unlawful under California and federal law.

62. Defendant fraudulently concealed from and intentionally failed to disclose to Plaintiff and other members of the proposed Class the truth about its advertised discount prices and former reference prices. Defendant concealed from consumers the true nature and quality of the products sold at its Express Factory Outlet stores.

63.    Defendant intentionally concealed and failed to disclose material facts regarding the truth about false former price advertising in order to provoke Plaintiff and the proposed Class to purchase Express Factory Outlet products in its stores.

64.    At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

65.    Plaintiff reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the items described herein at Defendant's Express Factory Outlet store. Plaintiff would not have made such purchases but for Defendant's representations of fabricated "original" prices and false discounts being offered on the merchandise she purchased.

66.    Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendant advertised and made purchases believing that they were receiving a substantial discount on items of greater value than their actual value. Plaintiff, and other Class members, were lured in, relied on, and were damaged by the deceptive pricing scheme that Defendant carried out.

## IV.    CLASS ALLEGATIONS

Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant:

All persons who, within the State of California and within the applicable statute of limitations preceding the filing of this action (the

"Class Period"), purchased from an Express Factory Outlet store one or more products at discounts from an advertised reference price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more Class, in connection with their motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

67. **Numerosity**: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

68. ***Existence and Predominance of Common Questions of Law and Fact***: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

a.      whether, during the Class Period, Defendant used falsely advertised reference prices on its Express Factory Outlet product labels and falsely advertised price discounts on merchandise sold in its outlet stores;

b.      whether Defendant ever offered items for sale or sold items at their advertised reference price;

c.      whether, during the Class Period, the original price advertised by Defendant was the prevailing market price for the products in question during the three months preceding the dissemination and/or publication of the advertised former prices;

d.      whether Defendant's purported sale prices advertised in its Express Factory Outlet stores reflected any actual discounts or savings;

e.      whether Defendant's purported percentage-off discounts advertised in its Express Factory Outlet stores reflected any actual discounts or savings;

f.      whether Defendant's alleged conduct constitutes violations of the laws asserted;

g.      whether Defendant's alleged conduct constitutes violations of federal and/or California pricing regulations;

h.     whether Defendant engaged in an unconscionable commercial practice, and/or employed deception or misrepresentation under the laws asserted;

i.     whether Plaintiff and Class members are entitled to damages and the proper measure of that loss; and

j.     whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

69.    *Typicality*: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived) by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of herself and all Class members.

70.    *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Class.

71.    *Superiority*: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to them and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual

Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

72.     All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices, advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at Express Factory Outlet stores.

73.     Plaintiff is informed that Defendant keeps extensive computerized records of its Express Factory Outlet customers through, *inter alia*, customer loyalty programs, credit card programs, and general marketing programs. Defendant has one

or more databases through which a significant majority of Class members may be identified and ascertained, and they maintain contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## V.    CAUSES OF ACTION

## <u>FIRST CAUSE OF ACTION</u>

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

74.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

75.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the UCL, CAL. BUS. & PROF. CODE §§ 17200, *et seq*.

76.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  CAL. BUS. PROF. CODE § 17200.

77.    The UCL imposes strict liability. Plaintiff and members of the proposed Class need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

### *"Unfair" Prong*

78.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

79.    Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, and constituted immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

80.    The harm to Plaintiff and members of the proposed Class outweighs the utility of Defendant's practices because Defendant's practice of advertising false discounts provides no utility. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

81.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

82.    Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff and members of the proposed Class and are highly likely to deceive members of the consuming public. Plaintiff and members of the proposed Class relied on Defendant's fraudulent and deceptive representations regarding its false or outdated "original prices" for products sold by Defendant at its Express Factory Outlet stores. These misrepresentations played a substantial role in Plaintiff's and members of the proposed Class's decision to purchase the product at a purportedly steep discount, and Plaintiff and members of the proposed Class would not have purchased the product without Defendant's misrepresentations.

### *"Unlawful" Prong*

83.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

84.    Defendant's acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law in connection with its deceptive pricing scheme. The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the

dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false

former pricing schemes, like Defendant's, are described as deceptive practices that

would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious - *for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction - the "bargain" being advertised is a false one*; the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price

> (b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of his business, honestly and in good faith - and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based. And the advertiser should scrupulously avoid any implication that a former price is a selling, not an asking price (for example, by use of such language as, "Formerly sold at $_____"), unless substantial sales at that price were actually made.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

85.    In addition to federal law, California law also expressly prohibits false

former pricing schemes. The FAL, CAL. BUS. & PROF. CODE § 17501, entitled

"*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

***No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement*** or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

CAL. BUS. & PROF. CODE § 17501 (emphasis added).

86.     As detailed in Plaintiff' Third Cause of Action below, the CLRA, CAL. CIV. CODE § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

87.     As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

88.     Defendant's practices, as set forth above, misled Plaintiff, the proposed Class, and the public in the past and will continue to mislead in the future. Consequently, Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

89.     Defendant's violations of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that

members of the proposed Class and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff and the members of the proposed Class.

90.     Pursuant to the UCL, Plaintiff and members of the proposed Class are entitled to preliminary and permanent injunctive relief enjoining Defendant from further engagement in this unfair competition, as well as disgorgement and restitution to Plaintiff and the proposed Class of all Defendant's revenues wrongfully obtained from them as a result of Defendant's unfair competition, or such portion of those revenues as the Court may find equitable.[31]

---

[31] California permits broad discretion to fashion remedies as needed, and "the appropriate measure of recovery [under the equitable provisions of California's consumer protection laws] depends on the nature of the case and the alleged harm that [a plaintiff] suffers." *Le*, 160 F. Supp. 3d at 1104. "California's consumer protection laws…authorize multiple forms of restitutionary recovery." *Id.* at 1105; *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) ("[I]n calculating restitution under the UCL and FAL, the focus is on the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the fraudulent or omitted information."); *Jacobo*, 2016 WL 3482041, at *7 ("Remedy for the alleged misconduct is not limited to the difference between the value of the goods [p]laintiffs purchased and the price for those goods*."); Russell v. Kohl's Dep't Stores, Inc.*, No. ED CV 15-1143 RGK (SPx), 2015 WL 12781206, at *3-4 (C.D. Cal. Oct. 6, 2015) (explaining why cost minus value is not the exclusive method of measuring restitution); *Spann v. J.C. Penney Corp.*, No. SA CV 12-0215 FMO (RNBx), 2015 WL 1526559, at *4 (C.D. Cal. Mar. 23, 2015) ("[A]lthough California case law makes clear that [cost minus

## SECOND CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")
### CAL. BUS. & PROF. CODE §§ 17500, *et seq.*

91.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

92.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the FAL, CAL. BUS. & PROF. CODE §§ 17500, *et seq.*

93.     CAL. BUS. & PROF. CODE § 17500 provides:

It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of . . . personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that . . . personal property or those services . . . which is ***untrue or misleading***, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . .

---

value] can be a measure of restitution, defendant has not cited, nor has the court found, any authority indicating that is the only way restitution can be calculated."); *Johns v. Bayer Corp.*, No. 09-cv-1935-AJB (DHB), 2012 WL 1520030, at *5 (S.D. Cal. Apr. 30, 2012) (finding that neither In re Vioxx nor any other case cited by the defendant "suggest[ed] that the difference in price paid and value received is the only proper measure of restitution"); *Stathakos*, 2016 WL 1730001, at *4 (challenge to restitution methodology premature at motion to dismiss stage); *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015) (explaining that *In re Vioxx Class Cases*, 180 Cal. App. 4th 116 (2009) did not limit measuring restitution to the price/value differential).

(Emphasis added).

94.    The "intent" required by section 17500 is the intent to make or disseminate personal property (or cause such personal property to be made or disseminated), and not the intent to mislead the public in the making or dissemination of such property.

95.    Similarly, this section provides, "no price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price … within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement." CAL BUS. & PROF. CODE § 17501.

96.    Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), constitutes an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were; therefore, leading to the false impression that the products sold at Defendant's Express Factory Outlet stores were worth more than they actually were.

97.    Defendant misled consumers by making untrue and misleading statements and failing to disclose what is required as stated in the Code alleged above.

98.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made during the course of Defendant's business, Plaintiff and members of the proposed Class suffered ascertainable loss and actual damages.

99.    Plaintiff and members of the proposed Class request that this Court order Defendant to restore this money to Plaintiff and the proposed Class, and to enjoin Defendant from continuing these unfair practices in violation of the FAL in the future. Otherwise, Plaintiff, members of the proposed Class, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## THIRD CAUSE OF ACTION

### Violation of California's Consumers Legal Remedies Act ("CLRA") CAL. CIV. CODE § 1750, *et seq.*

100.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

101.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the CLRA, CAL. CIV. CODE § 1750, *et seq.*

102.   Plaintiff and each member of the proposed Class are "consumers" as defined by CAL. CIV. CODE § 1761(d). Defendant's sale of products at its Express Factory Outlet stores were "transactions" within the meaning of CAL. CIV. CODE § 1761(e). The products purchased by Plaintiff and members of the proposed Class are "goods" or "services" within the meaning of CAL. CIV. CODE § 1761(a)-(b).

103.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by CAL. CIV. CODE § 1770(a) in transactions with Plaintiff and members of the proposed Class which were intended to result in, and did result in, the sale of products sold at its Express Factory Outlet stores:

a.   advertising goods or services with intent not to sell them as advertised; § 1770(a)(9); and

b.   making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions; § 1770(a)(13).

104.   On November 6, 2023, Plaintiff, through counsel, sent a CLRA demand letter by certified mail to Defendant that provided notice of Defendant's violation of the CLRA and demanded Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein. The letter also stated that if Defendant refused to do so, Plaintiff would file a complaint seeking

damages in accordance with the CLRA. Defendant Express, Inc., received this notice and demand letter on November 15, 2023.

105. Because Defendant has failed to rectify or remedy the damages caused by Defendant's actions or respond appropriately to Plaintiff after more than the statutorily required thirty (30) days after Defendant received the foregoing notice. Therefore, Plaintiff is timely filing this Complaint seeking actual, consequential punitive, and statutory damages as permitted under CAL. CIV. CODE § 1782(d).

106. Plaintiff asks that this Court enjoin Defendant from continuing to violate the CLRA as discussed herein and/or from violating the CLRA in the future and to order restitution to Plaintiff and the proposed Class. Plaintiff also requests an award of actual, statutory, and punitive damages, attorneys' fees and costs, and any other relief that the Court deems proper.

107. Filed concurrently is a declaration of venue pursuant to CAL. CIV. CODE §1780(d).

## VI.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representatives and their counsel as Class Counsel;

b.    awarding Plaintiff and the proposed Class members all applicable damages;

c.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

d.    awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices as set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money they are required to pay;

e.    ordering payment of damages as permitted by law, including actual, compensatory, and statutory damages, to the full extent permitted by law;

f.    retaining jurisdiction to monitor Defendant's compliance with permanent injunctive relief;

g.    ordering Defendant to engage in a corrective advertising campaign;

h.    awarding attorneys' fees and costs; and

i.    for such other and further relief as the Court may deem necessary or appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all of the claims so triable.

Dated: January 23, 2024

**LYNCH CARPENTER LLP**

By: */s/ Gary Lynch*

Gary F. Lynch (PA 56887)
gary@lcllp.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone:  412.322.9243
Facsimile    412.231.0246

**LYNCH CARPENTER LLP**
Todd D. Carpenter (CA 234464)
*Pro Hac Vice Forthcoming*
todd@lcllp.com
Scott G. Braden (CA 305051)
*Pro Hac Vice*
scott@lcllp.com
1234 Camino Del Mar
Del Mar, California 92014
Telephone:  619.762.1910
Facsimile:   724.656.1556

*Attorneys for Plaintiff and*
*Proposed Class Counsel*